# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

Elizabeth Tveter and
Holly Tveter

    v.                          Case No. 16-cv-329-PB
                                       Opinion No. 2018 DNH 148

Derry Cooperative School
District SAU #10, et al.

## MEMORANDUM AND ORDER

Elizabeth Tveter, a former student at Pinkerton Academy, and her mother, Holly Tveter, have sued Pinkerton Academy, the Derry School District, and eleven School District and Pinkerton employees. The Tveters argue that the defendants denied Elizabeth her right to a Free and Appropriate Public Education (FAPE) under the Individuals with Disabilities Education Act (IDEA), and discriminated against her, harassed her, and retaliated against her in violation of the Americans with Disabilities Act (ADA), the Rehabilitation Act, Title IX, the Fourteenth Amendment, and New Hampshire law. Defendants have challenged the Tveters' amended complaint with motions to dismiss (Doc. No. 44, 45, 46, 64).

## I.   BACKGROUND

### A.   Factual Background

Elizabeth Tveter enrolled as a Pinkerton Academy student in

the fall of 2012.[1]  Doc. No. 40 at 9.  In January 2014, she
suffered a severe head injury while playing field hockey on a
club team unaffiliated with Pinkerton.  Id.  As a result of that
injury, Elizabeth became disabled.  Her claims stem from the way
in which she was treated by school officials, teachers, and
students after she became disabled.

    1.  <u>Educational Services</u>

In late January 2014, after it became clear that Elizabeth
was disabled and would not be able to return to school in the
near future, Holly Tveter asked Pinkerton to provide homework
and tutoring services for her daughter so that she could
continue her education as she recovered.  Id. at 9-10.  Holly
contended that Elizabeth was entitled to these accommodations
under § 504 of the Rehabilitation Act of 1973, codified in 29
U.S.C. § 794.  Doc No. 40 at 9-10.  Pinkerton Guidance Counselor
John Chappell denied Holly's request because Elizabeth was an
honor student.  Id. at 10.  Pinkerton did not thereafter provide
any tutoring or educational assistance for Elizabeth until April
2014, when the school changed its position and developed a § 504
plan to accommodate her disability.  Id. at 10.

---

[1] Pinkerton is a private school in Derry, New Hampshire that is
organized as a nonprofit corporation.  In re Pinkerton Academy,
155 N.H. 1, 3 (2007).  Doc. No. 40 at 3.  Derry, Chester, and
Hampstead pay Pinkerton to provide a public education to
students who live in those towns.  Id. at 3.

Elizabeth attempted to return to school on a full-time basis in the fall of 2014, but soon switched to a part-time schedule. In November, she again attempted to return to school as a full-time student. School officials, however, incorrectly told Holly that Elizabeth's § 504 plan prohibited her from attending school full time. Id. When Elizabeth nevertheless attempted to attend classes without permission, her teachers physically blocked her from entering their classrooms. Id. at 15.

In December 2014, Pinkerton Academic Dean Christopher Harper called Holly and Elizabeth into school for a meeting to address Elizabeth's § 504 plan. Id. at 15. The school, however, neglected to inform the Tveters in advance that the meeting was being called to address Elizabeth's plan. Id. It also failed to have a teacher present at the meeting, failed to have an attendance sheet for the meeting, and failed to provide the Tveters with a written explanation of their § 504 rights. Id. Elizabeth's § 504 team agreed after the meeting to provide her with a speech-to-text device, but the school never followed through on its commitment. Id. at 123. The school also failed to provide her with teachers' notes. Holly was dissatisfied with the meeting and filed a discrimination complaint on Elizabeth's behalf with the Office for Civil Rights in the U.S. Department of Justice later that month. Id. at 16.

Shortly after Holly filed her discrimination complaint, Pinkerton Headmaster Gerald Morse allegedly retaliated against the Tveters by informing officials at the New Hampshire Division for Children, Youth, and Families (DCYF) that Elizabeth was in danger because Holly had not been taking her to the doctor to treat her head injury. Id. at 146. On April 4, 2015, DCYF investigated the Tveters and found no wrongdoing. Id. at 20.

School officials permitted Elizabeth to return to campus full time in May 2015, but they still prohibited her from attending her normal class schedule. Id. Instead, they required her to spend three and a half hours each day in the library, without instruction. Id. In October, Elizabeth was reinjured and forced to again leave school when another member of the field hockey team hit her in the head with a ball. Id. at 27. After Elizabeth was reinjured, school officials did not give her any classwork assignments, teachers' notes, or homework for the rest of the semester. Id. Elizabeth attempted to return to school in January 2016, but she was injured again almost immediately when another student struck her in the head with a ball in gym class. Id. at 27. She did not go back to school thereafter, but instead was permitted to complete her schoolwork from home.

In February 2016, the school agreed to provide Elizabeth with a hearing on her § 504 plan. Doc. No. 40 at 28. The

hearing officer did not allow Elizabeth to submit evidence within five days of the hearing, did not give her money to copy documents that were necessary to present her case, permitted school officials to admit records from Holly's divorce, did not allow Elizabeth to present claims that were not based on § 504, did not allow Holly to complete her cross examination of certain witnesses, and did not take Holly's own unspecified disability into account. Doc. No. 40 at 90-92.

2. <u>Athletics</u>

a. **Discrimination**

Elizabeth attempted to try out for the field hockey team when she returned to school in the fall of 2014, but the field hockey coach initially refused to allow her to join the team because of her disability. Although the coach later changed his mind and added her to the team, he told her she would be removed if she missed more than three practices even though non-disabled students were not subjected to the same attendance requirement.

School officials also initially attempted to block Elizabeth from joining the tennis team in 2015 because of her disability. The school eventually relented, however, and she was placed on the junior varsity team. When Elizabeth made the varsity team the following spring, her coach required her to wear a different colored uniform shirt from the uniforms worn by the non-disabled members of the team. Doc. No. 40 at 29.

### b.  Harassment by Students

After Elizabeth returned to the field hockey team in the fall of 2014, a group of teammates forced her to remove her uniform shirt while at a game.  Doc. No. 40 at 12-13.  Elizabeth was left wearing only her undergarments, and her teammates laughed at her.  Id. at 13.  On another occasion, Elizabeth's skirt was "forcibly removed in public by the same group of girls."  Id.  On third occasion, some of her teammates forcibly removed her socks while riding the bus to a field hockey game, and took them away from her.  Id.  A coach was sitting just a few feet away when this third incident occurred.  Id.

In January 2015, Guidance Counselor John Chappell approached Elizabeth in a school hallway and discussed Elizabeth's "personal situation" with her in front of other students.  Id. at 17.  After Chappell's talk with Elizabeth, the students who heard their discussion called Elizabeth derogatory names relating to her disability.  Id. at 18.

### c.  Harassment by Athletic Director

In April 2015, Pinkerton Athletic Director Timothy Powers watched Elizabeth during her tennis matches and followed her as she changed courts.  Id. at 21.  Powers approached Elizabeth after one practice, brushed his shoulder against hers, and followed her as she ran from him.  Id.  On another occasion, Powers physically bumped into Elizabeth at a school ice cream

social.  Id. at 24.  In July 2016, Powers stood outside a

classroom where Elizabeth was receiving tutoring and stared at

her.  Id. at 30.

B.    **Procedural History**

Defendants challenged the Tveters' complaints with motions

to dismiss.  Doc. No. 18, 21, 34.  In response, Elizabeth and

Holly filed objections that cited new facts and causes of

action.  Doc. No. 23, 35.  Several defendants responded with

motions to strike the Tveters' objections.  Doc. No. 25, 26.

Because the Tveters were attempting to present new factual

assertions and new claims to supplement their complaint, I

instructed them to file an amended complaint and denied

defendants' motions to dismiss without prejudice.  Doc. No. 39.

The Tveters then filed an amended complaint that asserted twelve

different causes of action against thirteen defendants.  Doc.

No. 40.  All of the defendants filed timely motions to dismiss

the amended complaint.


## II.    ANALYSIS

The Tveters assert claims based on the IDEA, the ADA, the

Rehabilitation Act, the Fourteenth Amendment's equal protection

and due process clauses, and various state law causes of action.

Defendants argue that I lack subject matter jurisdiction to

consider the Tveters' claims because they failed to comply with

the IDEA's exhaustion requirement.  They also assert that any of
the Tveters' claims that are not subject to the exhaustion
requirement fail to state viable claims for relief.

A.    **The Exhaustion Requirement**

The IDEA's exhaustion provision states:

> Nothing in [the IDEA] shall be construed to restrict
> or limit the rights, procedures, and remedies
> available under the Constitution, the [ADA], Title V
> of the Rehabilitation Act [including § 504], or other
> federal laws protecting the rights of children with
> disabilities, except that before the filing of a civil
> action under such laws seeking relief that is also
> available under [the IDEA], the [IDEA's administrative
> procedures] shall be exhausted to the same extent as
> would be required had the action been brought under
> [the IDEA].

Fry v. Napoleon Community Schools, 137 S.Ct. 743, 750
(2017)(alteration in original)(quoting 20 U.S.C. § 1415 (l)).
This requirement covers not only IDEA claims, but also claims
based on the ADA, the Rehabilitation Act, the Constitution, and
similar laws to the extent that the plaintiff is seeking relief
for the denial of a FAPE.  Id. at 753.  In determining whether
the exhaustion requirement has been met, a court must look to
the substance of the plaintiff's claims rather than the
artfulness of her pleading.  Id.  The duty to exhaust
administrative remedies applies both to claims for injunctive
relief and claims for damages even though the IDEA does not
provide a private right to sue for damages.  Frazier v.
Fairhaven Sch. Comm., 276 F.3d 52, 60 (1st Cir. 2002).

The IDEA defines a FAPE broadly to include "special education and related services." 20 U.S.C. § 1401(a).  The term is thus plainly broad enough to encompass the Tveters' claims that Elizabeth was improperly denied classroom instruction, teachers' notes, homework, assistive devices, tutoring, and proper procedures for pursuing her claims.[2]  See generally, Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 238-39 (2009).

A more difficult question is presented by the claims that stem from Elizabeth's participation in school sports. Defendants suggest that these claims are subject to the exhaustion requirement because Elizabeth's right to a FAPE includes a right to "related services," 20 U.S.C. § 1401(9), and the right to related services necessarily includes a right to "recreation," 20 U.S.C. §1401(26)(A).  I am unpersuaded by this argument.  Although participation in school sports can be a component of a student's right to a FAPE in certain

_____

[2] These claims are mostly set out in counts 4, 5, and 6 of the complaint.  Specifically, Elizabeth claims that the defendants failed to provide her with homework, tutoring, or any instruction while she was out of school due to her disability in 2014, 2015, and 2016 (Doc. No. 40 at 120); prevented her from returning to class after she had sufficiently recovered from her head injury (Id. at 121); failed to include Holly in the December 2014 meeting to modify Elizabeth's § 504 plan (Id. at 122); failed to give Elizabeth credit for some of her completed schoolwork (Id. at 122-123); and failed to provide her a "speech-to-text" device in accordance with her § 504 plan (Id. at 123).

circumstances, the statutory definition of "related services" provides that such services are an essential component of a FAPE only when they "may be required to assist a child with a disability to benefit from special education. . . ." Id.; see Meares v. Rim of the World Unified School District, 269 F.Supp.3d 1041, 1052-53 (C.D. Cal. 2016). The Tveters have not argued that Elizabeth was attempting to participate in school sports to further her educational goals. Nor did she have an individualized education program (IEP) that mandated participation in sports. Also significantly, the defendants do not point to any evidence that would support a claim that Elizabeth's participation in sports was a necessary component of her right to a FAPE. Given the unique circumstances of this case, therefore, the Tveters' sports-related claims are not subject to the exhaustion requirement because they do not seek relief for the denial of Elizabeth's right to a FAPE.

The Tveters argue that none of their claims are barred by the exhaustion requirement because they participated in a "§ 504 due process hearing." Doc. No. 40 at 28-29. This argument fails because a party's participation in a general "due process hearing" is not sufficient to satisfy the exhaustion requirement. Weber v. Cranston Sch. Comm., 212 F.3d 41, 53 (1st Cir. 2000)("IDEA's mandate is explicit: plaintiffs must exhaust IDEA's impartial due process hearing in order to bring a civil

action under subchapter II of IDEA . . . state and federal complaint procedures other than the IDEA due process hearing do not suffice for exhaustion purposes.").

The Tveters alternatively argue that they are not required to comply with the exhaustion requirement because it would have been futile to seek relief under the IDEA. The principal basis for their futility argument is their claim that "[p]laintiffs have requested numerous services and intervention[s] from the New Hampshire Department of Education time and again only to be told that they cannot help Elizabeth because she is a 504 student not an IEP and that she did not qualify for IDEA services." Doc. No. 60 at 23; see Doc. No. 40 at 16. I reject this argument. The Tveters cannot satisfy the futility exception merely by claiming that the New Hampshire Department of Education informed them that Elizabeth did not qualify for IDEA services. Before a child can be provided with special education services under the IDEA, a local educational agency such as Pinkerton must conduct an individualized evaluation of the child. 20 U.S.C. § 1414(a)(1). A parent cannot skip this vital step in the IDEA process and immediately request a due process hearing from the state. See C.G. ex rel. A.S. v. Five Town Cmty Sch. Dist., 513 F.3d 279, 285 (1st Cir. 2008) (outlining the procedural requirements for a parent to request and challenge an IEP). In the present case, the Tveters did

just that.  Their inability to obtain a due process hearing from the state stemmed from their failure to seek an IDEA evaluation from Pinkerton rather than the failure of the IDEA to provide them with a right to relief.  Accordingly, they are in no position to invoke futility as an exception to the exhaustion requirement.[3]

In summary, because the Tveters failed to comply with the exhaustion requirement, their claims that stem from the defendants' alleged failure to provide educational services to Elizabeth are dismissed.  The Tveters' sports-related claims are not subject to the exhaustion requirement.

**B.    Remaining Claims**

Defendants argue that any of the Tveters' sports-related

---

[3] Although Holly does not press the point, she might have argued more narrowly that her claim that Pinkerton unlawfully retaliated against her after she filed her discrimination complaint with the Department of Justice is saved by the futility exception because an IDEA proceeding could not effectively address her retaliation injury.  The First Circuit evaluated a similar contention in Weber v Cranston School District, 212 F.3d 41 (1st Cir. 2000).  In that case, the plaintiff claimed, among other things, that the defendants retaliated against her by "threatening to report her to the state child welfare agency." Id. at 44.  The court determined that the plaintiff's retaliation claim was subject to the exhaustion requirement and rejected an argument that futility excused her failure to exhaust her IDEA remedies. Id. at 52. The Tveters have failed to present any futility arguments that were not considered and rejected in Weber.  Accordingly, applying the court's reasoning in Weber, "[i]n light of the arguments made [I] must conclude that [the Tveters] had to comply with the exhaustion requirement of § 1451(1)." Id.

claims must be dismissed for failure to state a viable claim for
relief.  I address these claims by first considering the
Tveters' discrimination, harassment, and retaliation claims
under the ADA and the Rehabilitation Act.  I then turn to their
Title IX claims, their constitutional claims, and their state
law claims.

## 1.   ADA and Rehabilitation Act Claims

### a.  Discrimination Claims

The Tveters claim that the defendants are liable for
discrimination because they treated her differently than her
non-disabled teammates during her involvement in sports.  Doc.
No. 40 at 137-140.

To prove a discrimination claim under Title II of the ADA,
a plaintiff must prove: "(1) that he is a qualified individual
with a disability; (2) that he was either excluded from
participation or denied the benefits of some public entity's
services, programs, or activities or was otherwise discriminated
against; and (3) that such exclusion, denial of benefits, or
discrimination was by reason of the plaintiff's disability."
Parker v. Universidad de Puerto Rico, 225 F.3d 1, 5 (1st Cir.
2000) (citing 42 U.S.C. § 12132).  A discrimination claim under
the Rehabilitation Act similarly requires a plaintiff to prove:
"(1) that she is disabled; (2) that she sought services from a
federally funded entity; (3) that she was 'otherwise qualified'

to receive those services; and (4) that she was declined those services solely by reason . . . of her disability." Lesley v. Hee Man Chie, 250 F.3d 47, 52-53 (1st Cir. 2001)(citing 29 U.S.C. § 794(a)).

Defendants do not challenge the sufficiency of Elizabeth's discrimination claims against Pinkerton, but they do assert that she has failed to state a viable claim against the School District defendants. I agree with the latter contention. The School District is a separate legal entity and the Tveters do not allege sufficient facts in the amended complaint to support a plausible claim that the School District was a culpable participant in Pinkerton's alleged discrimination. Accordingly, the Tveters' discrimination claims against the School District are dismissed. All of the Tveters' ADA and Rehabilitation Act claims against the individual defendants are also dismissed because neither the ADA nor the Rehabilitation Act permit individual capacity actions. Gross v. Landry, No. 17-cv-297, 2017 WL 5509995, at *5 (D. Me. Nov. 17, 2017); Abbot v. Town of Salem, 2006 DNH 012, 4; Garcia v. S.U.N.Y. Health Sciences Center, 280 F.3d 98, 107 (2d Cir. 2001). Holly's ADA and Rehabilitation Act claims also fail because it was Elizabeth, not Holly, who was allegedly injured by Pinkerton's alleged discrimination and harassment.

### b. Harassment Claims

The Tveters next claim that Pinkerton and the School District are liable for harassment because the defendants failed to prevent Elizabeth's teammates from bullying her on multiple occasions because of her disability.

"To state a cognizable claim for hostile learning environment harassment under the ADA and Rehabilitation Act, a plaintiff must allege: (1) that she is a member of a protected group, (2) that she has been subject to unwelcome harassment, (3) that the harassment is based on a protected characteristic, her disability, (4) that the harassment is sufficiently severe or pervasive that it alters the conditions of her education and creates an abusive educational environment, and (5) that there is a basis for institutional liability." Guckenberger v. Boston University, 957 F. Supp. 306, 314 (D. Mass. 1997). The basis for institutional liability can include "deliberate indifference" to "student-on-student wrongdoing." S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cty, 819 F.3d 69, 74-75 (4th Cir. 2016).

Elizabeth alleges that her teammates forcibly removed her clothing, leaving her undergarments exposed, during at least two games. On one such occasion, after her shirt was removed, the other girls laughed at her because she was slow to react, a symptom of her disability. Moreover, they forcibly removed her

socks at least one time.  Another day at school, several students called Elizabeth a derogatory name for a student in a special education program.  Elizabeth and Holly complained to Pinkerton officials, making them aware of the situation, and yet they did not take any steps to remedy the harassment.  These allegations are minimally sufficient to state a viable claim for harassment under the ADA and the Rehabilitation Act against Pinkerton.

The Tveters do not allege that the School District had any direct role in policing student-on-student harassment at Pinkerton and they barely even allege that the School District knew about the harassment.  See Doc. No. 40 at 13.  Therefore, Elizabeth has not sufficiently stated a claim for harassment under the ADA and § 504 against the School District.

### c.    Retaliation

The Tveters also claim that Pinkerton and the School District are liable for retaliation because they failed to stop Elizabeth's teammates from harassing her on the basis of her disability after being told of the harassment.

To establish a prima facie retaliation claim under either the ADA or the Rehabilitation Act, a plaintiff must demonstrate that "(1) he or she engaged in protected conduct, (2) he or she was subject to adverse action by the defendant, and (3) there was a causal connection between the protected conduct and the

adverse action." D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26, 41 (1st Cir. 2012); Palmquist v. Shinseki, 689 F.3d 66, 70 (1st Cir. 2012).

Here, Elizabeth engaged in the "protected activity" of complaining about the other students' disability harassment. Her complaint made Pinkerton aware of the harassment. The "action disadvantageous to the actor" was Pinkerton's failure to act on Elizabeth's complaints of disability harassment. See Colon-Fontanez v. Municipality of San Juan, 660 F.3d 17, 37 (1st Cir. 2011) ("toleration of harassment" is an adverse action that can satisfy that element of a claim for retaliation under Title I of the ADA). The Tveters allege that the school failed to intervene to prevent further harassment by her teammates, despite knowing it had occurred in the past. This is minimally sufficient to allege a retaliatory motive. See id. Therefore, Elizabeth has stated ADA and § 504 retaliation claims against Pinkerton for its toleration of the bullying by other students. Because she has failed to allege sufficient facts to support a claim that the School District was a culpable participant in the harassment, her claim against the School District is dismissed.

2.  Title IX

The Tveters next claim that Elizabeth was subjected to sexual harassment in violation of Title IX when her teammates forcibly removed her clothing and Athletic Director Powers

17

followed her around school.  They also claim after Elizabeth was subject to retaliation under Title IX when she told Pinkerton that Powers was sexually harassing her.  I reject these claims.

### a.  Sexual Harassment by Students

Title IX states, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. . . ." 20 U.S.C. § 1681(a).  Courts have interpreted this language to prohibit two types of sexual harassment: "quid pro quo" harassment, where the perpetrator demands a sexual act from the victim in order for the victim to enjoy some benefit, and "hostile environment" harassment, where the perpetrator commits acts of a sexual nature that are "sufficiently severe and pervasive to compromise or interfere with educational opportunities normally available to students." Frazier, 276 F.3d at 65.

Either form of harassment requires proof that the plaintiff was harmed because of her sex.  Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 258 (1st Cir. 1999).  "The plaintiff must prove that the conduct at issue was not merely tinged with offensive sexual connotations, but in fact constituted discrimination because of sex." Id. (internal quotations and citations omitted).  In Morgan v. Town of Lexington, 138

F.Supp.3d 82, 94-95 (D. Mass. 2015), the court found that the act of a group of students pulling down the victim's pants three times in front of other students was "tinged with offensive sexual connotations," but nonetheless did not rise to the level of sexual harassment because the act was not done "because of sex."

The Tveters have alleged that Elizabeth's field hockey teammates repeatedly forced her to remove her shirt while in public, and forced her to remove her socks at least once while in the presence of her coach. While these actions are improper, there is no indication that the students took the actions because of Elizabeth's sex. Therefore, the Tveters have not alleged a viable sexual harassment claim based on the students' alleged harassment.

### b. Harassment by Powers

The Tveters claim that Athletic Director Timothy Powers sexually harassed Elizabeth over the course of many months by watching her play tennis while standing at a distance, following her as she changed courts during tennis matches, bumping into her twice, and looking at her classroom while she was receiving tutoring.[4] Doc. No. 40 at 140-143. The Tveters argue that the

---

[4] The Tveters assert new facts to support their sexual harassment claim against Athletic Director Powers in their oppositions to the defendants' motions to dismiss the amended complaint. Doc. No. 59 at 36-37, 39; Doc. No. 60 at 37. Elizabeth and Holly

defendants are liable for Powers' sexual harassment because they knew about this ongoing sexual harassment and did nothing to stop it.  Doc. No. 40 at 143.

"Hostile environment" harassment occurs under Title IX where the perpetrator commits acts of a sexual nature that are "sufficiently severe and pervasive to compromise or interfere with educational opportunities normally available to students." Frazier, 276 F.3d at 65.

In Frazier, the First Circuit held that a school discipline matron's act of observing victim going to the bathroom was not sexual harassment.  Id.  Similarly, in Keskinidis v. University of Massachusetts, Boston, 76 F. Supp. 3d 254, 255 (D. Mass. 2014), the court stated that a teacher's actions at a three-hour-long closed-door meeting with a student where he implied that "something could be done about her grade," while "rubbing his groin region," and repeatedly preventing her from leaving did not constitute hostile environment sexual harassment.

The Tveters allege that Athletic Director Powers "watched" Elizabeth play tennis, "bumped into" her one time at a school social event, and peered in through a classroom window one time. This behavior is not sufficiently severe or pervasive to

_____

have had numerous opportunities to amend their complaint with additional facts prior to the filing of these oppositions. Therefore, I do not consider the new facts alleged in the oppositions to the motions to dismiss.

constitute sexual harassment.  Because there was no sexual harassment, I dismiss the Tveters' claim that Elizabeth was sexually harassed by Athletic Director Powers.

###   c.  Retaliation

The Tveters argue that the defendants' failure to stop Powers' sexual harassment, after they informed them of the harassment, supports a retaliation claim in violation of Title IX.

To recover for retaliation under Title IX, a plaintiff must show "that she engaged in activity protected by Title IX, that the alleged retaliator knew of the protected activity, that the alleged retaliator subsequently undertook some action disadvantageous to the actor, and that a retaliatory motive played a substantial part in prompting the adverse action." Frazier, 276 F.3d at 67.  A plaintiff can prove that the defendant knew of the protected activity and "undertook some action disadvantageous to the actor," by showing that the defendant knew of and tolerated ongoing sexual harassment. Marrero v. Goya of Puerto Rico, Inc., 304 F.3d 7, 23, 26 (1st Cir. 2002) ("toleration of harassment" is an adverse action that can satisfy that element of a claim for retaliation under Title VII of the Civil Rights Act, which is evaluated under the same standard as Title IX).

The Tveters argue that the defendants' adverse action is the toleration of ongoing sexual harassment, with knowledge that the harassment is occurring. But, as stated above, Powers' actions do not qualify as sexual harassment. Therefore, toleration of these actions is not an adverse action, and their retaliation claim fails.

### 3. Constitutional Claims

The Tveters invoke 42 U.S.C. § 1983 in bringing multiple claims against the defendants under the Fourteenth Amendment's equal protection and due process clauses. They claim that Elizabeth's field hockey and tennis coaches prohibited her from playing on the varsity field hockey and tennis teams, subjected her to stricter rules than her non-disabled teammates, and made her wear a different uniform from her non-disabled teammates because of her disability, in violation of her equal protection rights. Doc. No. 40 at 137-140. They argue that the defendants violated Elizabeth's right to equal protection by failing to prevent her field hockey teammates from bullying her. Doc. No. 40 at 100-104; 156-157. They also claim that this failure to prevent Elizabeth's teammates from bullying her is a violation of her substantive due process rights. Doc. No. 40 at 85.

The First Circuit has held that Pinkerton is not a state actor for the purposes of § 1983. Johnson v. Pinkerton Academy, 861 F.2d 335, 337-38 (1st Cir. 1988). Accordingly, the

plaintiffs have failed to state viable constitutional claims against either Pinkerton or any of its employees.  This leaves only the Tveters' constitutional claims against the School District and Superintendent Laura Nelson.

1.  Equal Protection

To prove a violation of the equal protection clause on the basis of disability discrimination, a plaintiff must show that: (1) the defendant was a governmental actor; (2) the defendant intentionally treated the plaintiff differently from similarly situated individuals; and (3) the defendant lacked a rational basis for the disparate treatment.  Toledo v. Sanchez, 454 F.3d 24, 33 (1st Cir. 2006) ("The disabled are not a suspect class for equal protection purposes.").

The Tveters' equal protection claims against the School District and Superintendent Nelson must be dismissed because the Tveters have failed to allege a plausible claim that either defendant intentionally discriminated against the defendants on the basis of Elizabeth's disability.  Therefore, I dismiss the Tveters' equal protection claims against all defendants.

2.  Due Process

The Tveters also claim that the School District's failure to prevent Elizabeth's teammates from bullying her violates her due process rights.  In some instances, an institution's failure to protect a student from violence by other students can support

a viable substantive due process claim.  See Thomas v. Town of Chelmsford, 267 F. Supp. 3d 279, 297 (D. Mass. 2017).  But viable claims of this sort are rare and only arise when the school knew of a risk of extreme student-on-student violence and the school's own behavior "shocks the conscience."  See id. at 298-99 (a public school's decision to house a student in a bunk house with known bullies, while also knowing that those bullies had urinated in the student's cleats on a previous occasion, did not sufficiently "shock-the-conscience" to rise to the level of deliberate indifference, notwithstanding the horrific result of that decision, i.e. the student was raped with a broom handle).

The Tveters' allegations do not come close to alleging the type of egregious actions taken by the school that are required to support a substantive due process violation.  Therefore, I dismiss their due process claims for failure to state a claim.

**E.   State Law Claims**

The Tveters have also asserted New Hampshire state law claims for negligence, breach of fiduciary duty, premises liability, and loss of consortium.  Most of these claims fail in whole or in part for reasons I have already discussed.  Their claims that stem from Elizabeth's request for educational services are subject to the IDEA's exhaustion requirement.  Their claims based on gender harassment and retaliation fail because the Tveters have not pleaded plausible claims for relief

24

based on these theories.  Their claims against the School
District and its employees fail because the Tveters have not
pleaded plausible claims that any of these defendants were
culpable participants in Pinkerton's alleged wrongdoing.
Holly's claims fail because it was Elizabeth, rather than Holly,
who was injured by defendants' alleged misconduct.  This leaves
only claims that are based on Pinkerton's toleration of
harassment of Elizabeth by other members of the field hockey
team.

 The New Hampshire Supreme Court has recognized that
secondary schools such as Pinkerton "share a special
relationship with students entrusted to their care which imposes
upon them certain duties of reasonable supervision." Marquay v.
Eno, 139 N.H. 708, 717 (1995); see also Gauthier v Manchester,
168 N.H. 143, 147 (2015).  Not every harm that befalls a student
while in a school's care, however, will support a claim for
negligence.  The court has explained that the duty of reasonable
supervision extends "to only those periods of time when parental
protection is compromised, and only to those risks that are
reasonably foreseeable." Mikell v Sch. Admin. Unit #33, 158
N.H. 723, 731 (2009).  Further, only school employees who have
supervisory authority over students can be held liable for a
breach of this duty. Marquay, 130 N.H. at 717-18.  Although the
New Hampshire Supreme Court has not expressly held that the

25

special relationship between secondary schools and their students can give rise to a duty to prevent discriminatory harassment by other students, the court has held that colleges owe fiduciary duties to their students in certain circumstances to prevent discriminatory harassment by faculty members. Schneider v. Plymouth State College, 144 N.H. 458, 463 (1999). Because the special relationship that exists between secondary schools and their students is at least as protective of students as the fiduciary relationship that protects college students, a similar duty applies to secondary schools, at least in circumstances such as those at issue in Schneider.

Defendants present only a conclusory challenge to Elizabeth's negligence claim and it is impossible to conclude from the limited argument they have presented that the amended complaint fails to state a viable claim for relief against Pinkerton and the coach who allegedly witnessed the harassment. Accordingly, I refuse to dismiss Elizabeth's negligence claim against Pinkerton and Coach Resmini.[5]

The Tveters' remaining state law claims are obviously deficient. Their breach of fiduciary duty claim must be dismissed because the New Hampshire Supreme Court has declined

---

[5] To the extent that the Tveters assert negligence claims against other individual defendants, they have failed to plead sufficient facts to support plausible claims against those defendants.

to recognize that secondary schools owe fiduciary duties to their students.  See Marquay, 138 N.H. at 717; Brodeur v. Claremont Sch. Dist., 626 F. Supp. 2d 195, 219 n.24 (D. N.H. 2009).  Their premises liability claim fails because this case does not arise from the improper maintenance and operation of Pinkerton's property.  See Rallis v. Demoulas Super Markets, Inc., 159 N.H. 95, 99 (2009).  Finally, Holly's loss of consortium claim fails because loss of consortium between parents and children is not a valid cause of action in New Hampshire.  Sciliano v. Capitol City Shows, 124 N.H. 719, 728 (1984).

## IV.  CONCLUSION

All of the Tveters' claims are dismissed except Elizabeth's sports-related ADA and Rehabilitation Act discrimination, harassment, and retaliation claims against Pinkerton and her negligence claims against Pinkerton and her former field hockey coach, Jennifer Resmini.

SO ORDERED.

/s/ Paul Barbadoro
Paul Barbadoro
United States District Judge

July 20, 2018

cc:  Elizabeth Tveter, pro se
     Holly Tveter, pro se

Dona Feeney, Esq.
Joshua S. Hilliard, Esq.
Alison M. Minutelli, Esq.
Dean B. Eggert, Esq.
S. David Siff, Esq.