**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**


<u>**Elizabeth Tveter**</u>

     v.                                  Case No. 16-cv-329-PB
                                             Opinion No. 2020 DNH 193

<u>**Pinkerton Academy et al.**</u>


<u>**MEMORANDUM AND ORDER**</u>

Children with disabilities are protected by several federal statutes.  The Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 <u>et</u> <u>seq.</u>, guarantees disabled school children the right to a "free appropriate public education" ("FAPE"), 20 U.S.C. § 1412(a)(1)(A).  Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 <u>et</u> <u>seq.</u>, and Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794, also protect disabled children from unlawful discrimination, harassment, and retaliation.  Congress has specified, however, that a would-be litigant must comply with the IDEA's exhaustion requirement before suing under either the ADA or the Rehabilitation Act if the relief she seeks is also available under the IDEA.  <u>See</u> 20 U.S.C. § 1415(l).  The principal issue presented by the pending summary judgment motion is whether the plaintiff's remaining ADA and Section 504 claims are subject to the IDEA's exhaustion requirement.

## I.   BACKGROUND

**A.   Factual Background[1]**

The plaintiff in this case, Elizabeth Tveter, began attending Pinkerton Academy as a freshman in the fall of 2012. In her freshman and sophomore years, she played on Pinkerton's varsity field hockey team.  She was an exceptional player and well-liked both by her teammates and the school's athletic staff.

In January 2014, Tveter suffered a traumatic brain injury while playing field hockey on a club team unaffiliated with Pinkerton.  As a result of that injury, Tveter became disabled.

1.   Facts Related to Tveter's Accommodation Plans

Shortly after her injury, Tveter was identified as a qualified student with a disability under Section 504 of the Rehabilitation Act.  A Section 504 plan was developed for her in April 2014.  One of the plan's accommodations granted Tveter

---

[1] Consistent with the summary judgment standard, the facts are presented in the light most favorable to Tveter as the non-moving party.  See Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 348 (1st Cir. 2018).  I summarize only those facts that are relevant to my resolution of the defendants' motion, which I gleaned from the parties' statements of undisputed facts and the summary judgment record.  I note, however, that neither party was judicious in selecting materials for inclusion in the summary judgment record, which spans over 600 pages.  To the extent there are relevant facts in the record that the parties did not bring to my attention, it suffices to note that "courts are not required to ferret through sloppy records in search of evidence supporting a party's case." Mercado-Alicea v. P.R. Tourism Co., 396 F.3d 46, 51 (1st Cir. 2005).

extra time to complete academic assignments.  See Ex. 18 in
Supp. of Pl.'s Obj. to Defs.' Mot. for Summ. J. ("Pl.'s Ex."),
Doc. No. 210-1 at 35.  Tveter retained her Section 504 plan
until she graduated in 2016.

In March 2015, Tveter was identified as having a qualifying
disability under the IDEA.  Pinkerton proposed an individualized
education program ("IEP") for her and assembled an IEP team.
The proposed IEP contained a variety of academic accommodations
and one nonacademic accommodation for Tveter's disability.  The
academic accommodations included extended time for completing
tests and assignments, a quiet location for taking tests and
quizzes in the company of a paraprofessional, open notes for
tests and quizzes, ability to orally supplement tests, quizzes
and assignments, adjustments to lengths of writing assignments
with emphasis on quality over quantity, access to a speech-to-
text device, access to teachers' notes, ability to leave class
3-5 minutes early, a quiet setting for lunch, access to a quiet
area without bright lights when feeling unwell, and access to
elevators.  See Ex. 3 in Supp. of Defs.' Mot. for Summ. J.
("Defs.' Ex."), Doc. No. 182-3 at 13-14.

In addition, Tveter's mother requested that the IEP include
a nonacademic accommodation related to Tveter's participation in
school sports.  The IEP team agreed to include that request in
her draft IEP, which stated that Tveter would "remain eligible

3

for athletics and extra[]curricula[r] activities provided coursework is incomplete as a result of the implementation of these accommodations for her disability." Doc. No. 182-3 at 14; see Defs.' Ex. 1, Doc. No. 182-1 at 1-2.

In November 2015, the IEP team completed its review of Tveter's draft IEP. Although Tveter and her mother initially agreed to the IEP with an exception pertaining to the sports-related accommodation, they subsequently rescinded the agreement and refused the IEP altogether on November 30. See Doc. No. 182-1 at 2; Defs.' Ex. 4, Doc. No. 182-4 at 1-2.

Tveter and her mother received copies of the New Hampshire Procedural Safeguards Handbook for Special Education. See Doc. No. 182-1 at 2. They did not request an administrative due process proceeding to challenge any area of disagreement with the IEP. See Doc. No. 182-1 at 2.

   2.   Facts Related to Tveter's Participation in Athletics

In the fall of 2014, Tveter, then a junior, attempted to try out for Pinkerton's field hockey team. The school's athletic director refused to allow her to participate in the tryouts or even to sit in the bleachers to watch, which she was required to do in order to reserve a spot on the team as an injured player. The athletic director explained that she was ineligible to try out for the team because she had incomplete grades, even though her Section 504 plan allowed her extra time

4

to finalize those grades.  He also cited her lack of a medical clearance to participate in the sport, despite Pinkerton's receipt of multiple notes from Tveter's treatment providers clearing her to participate in tryouts and certain drills.  See Pl.'s Ex. 36, Doc. No. 210-1 at 60-62.

After her parents filed a complaint with Pinkerton, Tveter was permitted to join the varsity field hockey team.  She did not play in any games that season.  After incrementally clearing her to return to play, Tveter's treating providers cleared her for full participation in the sport at the end of October 2014, after the regular season had ended and the playoffs had begun. See Doc. No. 210-1 at 62-65; Defs.' Ex. 14, Doc. No. 182-14 at 14-15; Defs.' Ex. 6, Doc. No. 182-6 at 2-3.  At that point, however, Pinkerton still did not allow her to play, citing the fact she had not completed Pinkerton's concussion protocol, as she was continuing to report symptoms of a concussion.  See Doc. No. 182-6 at 2-3.

On four separate occasions that season, Tveter's field hockey teammates pressured her into giving up items of clothing that someone on the team needed, including a pair of socks, a skirt, a practice jersey, and an undershirt.  See Pl.'s Ex. 4, Doc. No. 210 at 93-101.  In her complaint Tveter calls those incidents "gang stripping" and alleges that her skirt was "forcibly" removed, Am. Compl. ¶¶ 34-36, however she has

5

presented no admissible evidence to support those claims. Indeed, in her deposition Tveter could not remember the circumstances surrounding three of the incidents and could only recall the incident involving her socks in some detail.  See Doc. No. 210 at 93-101.  She testified that, while the team was on the bus on the way to a game, one of her teammates told Tveter to give her Tveter's brand-new socks in exchange for a pair of socks that were the wrong color.  Tveter tearfully relented after two other girls joined in telling her she needed to hand over her socks because Tveter would not be playing in the game.  See Doc. No. 210 at 96-97.  Nothing similar had happened to Tveter in the prior years on the team before she became disabled.

Coach Resmini was on the bus when this incident occurred, but there is no evidence that she witnessed it or was told about it at the time.  See Doc. No. 210 at 97.  A few days later, in early November 2014, Tveter's mother emailed Coach Resmini about the clothing incidents.  See Pl.'s Ex. 28, Doc. No. 210-1 at 49. This was the first time the incidents were brought to the attention of a school employee.  In the email, Tveter's mother described what had happened with the socks and noted that there had been other instances when Tveter's teammates had "turned to" Tveter for items they needed and that she had complied because she was "kind[]hearted."  Doc. No. 210-1 at 49.  The email makes

6

no mention of bullying or harassment.  See Doc. No. 210-1 at 49.

Coach Resmini met with Tveter and her mother to discuss the

incidents.  See Doc. No. 210 at 152.  In that meeting, Tveter

and her mother complained that the incidents constituted

bullying.  See Doc. No 210 at 152.  Coach Resmini spoke with the

student who took Tveter's socks and that student gave Tveter a

pair of socks shortly after.  See Doc. No. 210 at 151; Doc. No.

210-1 at 49.  Coach Resmini did not take further steps to remedy

the situation, as the field hockey season had ended.  See Doc.

No. 210 at 152.

After discovering that the wrong socks had been returned to

Tveter, her mother emailed school officials in February 2015,

referring to the bus incident as bullying.  See Doc. No. 210 at

73.  Pinkerton staff investigated and found that no bullying had

occurred.  They concluded that Tveter had loaned her teammate

one pair of socks and that she had received two pairs in return.

See Doc. No. 210 at 74.  Because her mother insisted that the

two pairs of socks Tveter had received were of inferior quality,

Pinkerton reimbursed her for a new pair.  See Defs.' Ex. 12,

Doc. No. 182-12 at 10.

The following month, Tveter signed up for tennis tryouts,

but the athletic director told her she was not eligible to

participate.  See Pl.'s Ex. 1, Doc. No. 210 at 16-17.  Initially

he cited her failing grade in one class, even though he knew the

only reason she was failing was Pinkerton's refusal to allow her to attend that class.  See Doc. No. 210 at 16-17.  When the grade was corrected in response to a complaint from her parents, the athletic director again found Tveter ineligible for the tryouts.  See Doc. No. 210 at 17.  This time he cited her incomplete grade in another class, even though Tveter's Section 504 plan provided her extra time to complete assignments for that class.  See Doc. No. 210 at 17.  The athletic director also refused to grant Tveter an exception pursuant to the rules of the New Hampshire Interscholastic Athletic Association ("NHIAA"), which permit Pinkerton to exempt a disabled student from such academic requirements.  See Doc. No. 210-1 at 65-66. Tveter's mother reported the athletic director's actions to Pinkerton, alleging bullying, harassment, discrimination, and retaliation.  See Doc. No. 210 at 16-17.

In the interim, Tveter completed the missing academic work, and Pinkerton responded to the complaint by notifying her mother that Tveter was now eligible to try out for tennis.  See Doc. No. 210 at 16.  Because tryouts for the varsity tennis team were over by then, however, Tveter was given the choice to join the junior varsity team, as the lowest ranking member.  See Doc. No. 210-1 at 67.  Tveter was the only member of the team who was not given a team uniform, even after she rose through the ranks and began playing in tournaments.  See Doc. No. 210-1 at 67.

In August 2015, at the start of her senior year, Tveter
again signed up for field hockey tryouts.  Pinkerton informed
her that she did not meet the academic eligibility criteria for
the sport because she had an incomplete grade in one class, once
more disregarding her Section 504 plan's accommodation of extra
time for completing academic work and the NHIAA provision
allowing exemptions for disabled students.  See Doc. No. 210-1
at 69-70.  Tveter managed to finalize her grade the morning of
the tryouts and made the varsity field hockey team.  See Doc.
No. 210-1 at 70.  In the meantime, her mother filed a complaint
with Pinkerton, alleging that the school was discriminating
against Tveter and denying her an equal opportunity to
participate in sports.  See Doc. No. 210-1 at 70.

At the end of September, Tveter's mother filed another
grievance with Pinkerton alleging discrimination and
retaliation.  She complained that Tveter was no longer a
"starter" on the field hockey team, was not permitted to play in
her "permanent" position, and was not given adequate playing
time in games.  See Doc. No. 210 at 10-11.  She also alleged
that Coach Resmini was retaliating against Tveter, noting that
Tveter's playing time was drastically decreased a week after
Coach Resmini learned that the mother had spoken to Pinkerton's
Section 504 coordinator about these issues.  See Doc. No. 210 at
11.  The Section 504 coordinator investigated the complaint and

found no evidence of discrimination or retaliation.  She concluded that there were no permanent positions on the team and that Coach Resmini was giving Tveter less playing time and not including her in the starting lineup because other players were stronger than Tveter and made more accurate passes.  See Doc. No. 210 at 13-14.

Later that season, in October 2015, Tveter was struck in the back of the head with a field hockey ball during pregame warmups.  See Pl.'s Ex. 44, Doc. No. 210-2 at 11-12.  Tveter suffered a concussion and had to be out of school for an extended period.  After her mother complained that this incident constituted bullying and harassment, Pinkerton investigated and found that it was an accident.  According to Pinkerton's investigation, Tveter was on the sidelines while other players were warming up.  One of her teammates hit an aerial ball, which deflected off another teammate's stick and hit Tveter in the back of the head.[2]  See Doc. No. 210-2 at 11-12, 21-24.

In January 2016, three days after Tveter was medically cleared to return to school for forty-five minutes per day, she

---

[2] Although Tveter contends that there are "significant disagreements" about how she was injured, see Pl.'s Obj. to Defs.' Mot. for Summ. J., Doc. No. 203 at 19, she has not pointed to admissible evidence to support her claim that the blow to her head was not an accident.  The fact that the teammate who hit the ball was one of the girls involved in the clothing incidents the year before is insufficient to allow a reasonable inference that the hit was intentional.

was injured in a unified gym class during a floor hockey game. According to Tveter, one of her field hockey teammates (who was not involved in the October incident) hit a sponge ball using a plastic stick toward Tveter at close range and struck her in the face, causing her head and neck to whip back.  See Defs.' Ex. 28, Doc. No. 182-28 at 3; Doc. No. 210 at 87-91.  That same day, Tveter's mother filed a complaint with Pinkerton, alleging that the incident constituted bullying.  Pinkerton investigated and found it to be an accident.  See Doc. No. 182-28 at 2; Pl.'s Ex. 10, Doc. No. 210 at 166-180.  Several witnesses, including the gym teacher, contradicted Tveter's account that she was hit in the face at close range.  See Doc. No. 210 at 176-80.  They wrote that the ball, which was soft for players' safety, was hit from afar toward the goal and accidentally hit Tveter in the upper chest area.  See Doc. No. 210 at 176-80.

Two months later, Tveter informed Pinkerton that she again intended to try out for the tennis team.  See Pl.'s Ex. 2, Doc. No. 210 at 43.  Pinkerton responded that, considering her recent injuries, she would be permitted to participate in the tryouts only if she completed the school's five-day concussion protocol. See Doc. No. 210 at 44-45.  Tveter's mother complained that it was inappropriate to apply the protocol to her daughter and that this was another instance of retaliation.  See Doc. No. 210 at 45-47.  Pinkerton, however, remained adamant in requiring Tveter

to complete the concussion protocol and, as a result, she missed the tryouts.  See Doc. No. 210 at 48-49.  Once she completed the protocol and her medical provider cleared her to participate in the sport, Tveter joined the varsity tennis team.  See Doc. No. 210 at 47-48.  Instead of receiving a white jersey that other students on the team had received, she was provided a red one. See Doc. No. 210 at 40-41, 44.[3]  Thus, for the second year in a row, Tveter was singled out by not having a team uniform for tennis.

Finally, at a sports award ceremony in June 2016, Tveter did not receive several awards that she had earned as a scholar athlete.  In an email to school officials, her mother cited this as further evidence of Pinkerton's retaliation against Tveter. See Doc. No. 210 at 28.

**B.**   **Procedural History**

Tveter and her mother filed this lawsuit in July 2016, shortly before Tveter's graduation from Pinkerton.  The amended complaint asserted twelve different causes of action against thirteen defendants.  See Am. Compl., Doc. No. 40.  The complaint alleged that the defendants denied Tveter her right to a FAPE under the IDEA, and discriminated against her, harassed

---

[3] Pinkerton informed Tveter that the white jerseys were in limited supply and that the tennis coach would find her one, but apparently Pinkerton did not follow through on this promise. See Doc. No. 210 at 40.

her, and retaliated against her in violation of the ADA, Section
504, Title IX, the Fourteenth Amendment, and New Hampshire law.
The defendants moved to dismiss the complaint.

I dismissed the claims that Tveter was improperly denied
educational services such as classroom instruction and tutoring
on the ground that those claims sought relief from the denial of
a FAPE and that Tveter had failed to exhaust her administrative
remedies under the IDEA before filing suit. See Tveter v. Derry
Coop. Sch. Dist. SAU #10, 2018 WL 3520827, at *3 (D.N.H. July
28, 2018). I rejected, however, the defendants' argument that
Tveter's claims stemming from her participation in school sports
were also subject to the IDEA exhaustion requirement. The
defendants argued that those claims had to be exhausted because
Tveter's right to a FAPE included a right to "related services,"
20 U.S.C. § 1401(9), and the right to related services
necessarily included a right to "recreation," id. § 1401(26)(A).
This argument failed to persuade me because the definition of
"related services" states that such services are an essential
component of a FAPE only when they "may be required to assist a
child with a disability to benefit from special education." Id.
§ 1401(26)(A). Because the defendants did not argue that Tveter
sought an educational benefit from her participation in school
sports, that she had an IEP that concerned her participation in
sports, or that her participation in sports was a necessary

13

component of her FAPE, I concluded that the defendants' sole
argument on exhaustion did not merit dismissal of her sports-
related claims.  See Tveter, 2018 WL 3520827, at *4.

     With respect to the remaining claims, I refused to dismiss
Tveter's negligence claims against Pinkerton and Coach Resmini
because the defendants presented only a conclusory challenge
that the allegations concerning their failure to protect Tveter
from harassment by her former field hockey teammates failed to
state a claim.  See id. at *9.  I dismissed Tveter's
constitutional, Title IX, and other state law claims, as well as
her mother's claims, for failure to state a claim upon which
relief may be granted.  See id. at *5-10.

     Pinkerton and Resmini now move for summary judgment on all
surviving claims.  They again argue that Tveter's sports-related
claims require exhaustion under the IDEA.  This time they point
to evidence showing that Tveter's proposed IEP included, at her
mother's request, an accommodation related to her participation
in school sports, and they cite the regulations implementing the
IDEA for the proposition that having an equal opportunity for
participation in extracurricular and nonacademic activities is
within the scope of a FAPE.  See Defs.' Memo. in Supp. of Mot.
for Summ. J., Doc. No. 180-1 at 10-11 (citing 34 C.F.R.
§ 300.107).  The defendants also argue that no reasonable jury
could find, based on the summary judgment record, that they are

                                  14

liable on any of the remaining claims.  Tveter has filed an objection to the motion.  See Doc. No. 203.

## II. __STANDARD OF REVIEW__

Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Tang v. Citizens Bank, N.A., 821 F.3d 206, 215 (1st Cir. 2016).  In this context, a "material fact" is one that has the "potential to affect the outcome of the suit." Cherkaoui v. City of Quincy, 877 F.3d 14, 23 (1st Cir. 2017) (internal quotation marks omitted).  A "genuine dispute" exists if a jury could resolve the disputed fact in the nonmovant's favor. Ellis v. Fidelity Mgmt. Trust Co., 883 F.3d 1, 7 (1st Cir. 2018).

The movant bears the initial burden of presenting evidence that "it believes demonstrates the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); accord Flovac, Inc. v. Airvac, Inc., 817 F.3d 849, 853 (1st Cir. 2016).  Once the movant has properly presented such evidence, the burden shifts to the nonmoving party to designate "specific facts showing that there is a genuine issue for trial," Celotex, 477 U.S. at 324, and to "demonstrate that a trier of fact could reasonably resolve that issue in its favor." Flovac, 817 F.3d at 853 (internal quotation marks and brackets omitted).  If the nonmovant fails to adduce such evidence on

15

which a reasonable factfinder could base a favorable verdict, the motion must be granted.  See id.  In considering the evidence presented by either party, all reasonable inferences are to be drawn in the nonmoving party's favor.  See Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 348 (1st Cir. 2018).

### III. **ANALYSIS**

Defendants argue that they are entitled to summary judgment on Tveter's remaining federal claims because she failed to exhaust her administrative remedies under the IDEA.  In the alternative, they contend that no reasonable jury could find for Tveter on those claims.  They also argue that her negligence claims fail because there is no evidence that defendants failed to reasonably supervise Tveter's classmates during either event when a ball hit her.  I agree with the defendants that Tveter's sports-related claims under the ADA and Section 504 seek relief that is available under the IDEA and, therefore, those claims are subject to the IDEA's exhaustion requirement.  I also conclude that Tveter's negligence claims fail because no reasonable jury could find that Pinkerton or Coach Resmini negligently supervised Tveter's classmates on the two occasions when she was physically injured.

### A. **The Exhaustion Requirement**

The IDEA requires schools receiving federal funds to ensure that children with disabilities have available to them a "free

16

appropriate public education," commonly referred to as a "FAPE." 20 U.S.C. § 1412(a)(1)(A). "As defined in the [IDEA], a FAPE comprises 'special education and related services' — both 'instruction' tailored to meet a child's 'unique needs' and sufficient 'supportive services' to permit the child to benefit from that instruction." Fry v. Napoleon Cmty. Sch., 137 S. Ct. 743, 748–49 (2017) (quoting 20 U.S.C. § 1401(9), (26), (29)). Schools must provide FAPE in the "[l]east restrictive environment." Parent/Prof'l Advocacy League v. City of Springfield, 934 F.3d 13, 19 (1st Cir. 2019) (quoting 20 U.S.C. § 1412(a)(5)). A disabled child's IEP – her written education plan – is the "primary vehicle" for providing the mandated FAPE. Fry, 137 S. Ct. at 749 (quoting Honig v. Doe, 484 U.S. 305, 311 (1988)).

The IDEA provides an administrative process for parents to challenge their child's IEP or its implementation. See 20 U.S.C. § 1415. Initially, parents can request a preliminary meeting or mediation with the child's IEP team, and, if the dispute remains unresolved, they can ask for a "due process hearing" before an impartial hearing officer. See id. § 1415(b)-(f). A hearing officer may grant relief based upon "a determination of whether the child received a [FAPE]." Id. § 1415(f)(3)(E)(i). If the hearing is conducted by a local educational agency, parents can appeal an adverse ruling to the

state educational agency.  See id. § 1415(g).  Parents can sue in court only after they have exhausted these administrative procedures.  See id. § 1415(i)(2)(A).

The ADA and Section 504, which focus more broadly on "non-discriminatory access to public institutions," also protect disabled children from discrimination that occurs in school. Fry, 137 S. Ct. at 756.  Indeed, "[t]he same conduct [can] violate all three statutes . . . ."  Id.  The IDEA expressly recognizes that parents may seek relief under multiple statutes, but it requires exhaustion of the IDEA's administrative remedies first where parents are "seeking relief that is also available under" the IDEA.  20 U.S.C. § 1415(l); see Fry, 137 S. Ct. at 750.  "[T]o meet that statutory standard, a suit must seek relief for the denial of a FAPE, because that is the only 'relief' the IDEA makes 'available.'"  Fry, 137 S. Ct. at 752.

When determining whether a complaint seeks relief from such a denial, courts must "set[] aside any attempts at artful pleading" and "look to the substance, or gravamen, of the plaintiff's complaint."  Id. at 752, 755.  The Court in Fry provided commonsense guidance for approaching this task, explaining that one "clue" concerning the nature of the relief sought comes from answers to two hypothetical questions:

> First, could the plaintiff have brought essentially
> the same claim if the alleged conduct had occurred at
> a public facility that was not a school — say, a

> public theater or library?  And second, could an <u>adult</u>
> at the school — say, an employee or visitor — have
> pressed essentially the same grievance?

Id. at 756 (emphasis in original).  The Court explained that if

the answer to both questions is yes, then it is "unlikely" that

the complaint is about the denial of a FAPE.  Id.  By contrast,

when the answer to both questions is no, then the complaint

"probably" concerns a FAPE.  Id.  Consistent with the examples

the Supreme Court gave when applying the Fry hypotheticals, see

id. at 756-757, other courts have explained that these questions

are fact-intensive and should not be "approach[ed] . . . at a

high[] level of generality."  Nelson v. Charles City Cmty. Sch.

Dist., 900 F.3d 587, 592 (8th Cir. 2018); see McMillen v. New

Caney Indep. Sch. Dist., 939 F.3d 640, 646 (5th Cir. 2019).

Further, when a plaintiff invokes the IDEA administrative

process prior to filing suit, depending on the facts, this may

be another "sign" that the complaint is seeking relief from the

denial of a FAPE.  Fry, 137 S. Ct. at 757.  "[B]ut the converse

is not true."  Nelson, 900 F.3d at 593.  The fact that a

plaintiff did not invoke the formal grievance procedures under

the IDEA is not evidence that the gravamen of the complaint is

something other than a FAPE.  See id.

The question in this case is whether Tveter's ADA and

Section 504 claims arising from her participation in school

sports seek relief from the denial of a FAPE.  The defendants'

argument on summary judgment, which they did not present and I
did not evaluate in connection with their motions to dismiss, is
that the IDEA's implementing regulations show that, as part of a
FAPE, schools must provide accommodations to give disabled
students an equal opportunity to participate in school sports,
which the defendants say is precisely what Tveter sought and
Pinkerton allegedly failed to provide.

At the heart of this new argument is the IDEA's mandate
that an IEP include "supplementary aids and services" to enable
a disabled child to "participate in extracurricular and other
nonacademic activities" with nondisabled children.  See 20
U.S.C. § 1414(d)(1)(A)(i)(IV).  The statute does not define
extracurricular or nonacademic activities.  However, it defines
"supplementary aids and services" as

> aids, services, and other supports provided in regular
> education classes or other education-related settings
> to enable children with disabilities to be educated
> with nondisabled children to the maximum extent
> appropriate in accordance with section 1412(a)(5) of
> this title.

Id. § 1401(33).

These statutory provisions create ambiguity as to whether a
school must provide supplementary aids and services for
extracurricular and nonacademic activities only when such
activities are needed to directly further a disabled student's
educational needs.  When read in isolation, the definition of

"supplementary aids and services" could be read to suggest that
the term applies only to aids and services that are provided in
the classroom or other similar educational settings.  But that
narrow reading is difficult to reconcile with the ordinary
understanding of the statutory mandate that an IEP include
"supplementary aids and services" that are provided to enable
the child to "participate in extracurricular and other
nonacademic activities."  Id. § 1414(d)(1)(A)(i)(IV).

     The federal regulations promulgated under the IDEA resolve
that statutory uncertainty in favor of a broad construction of
FAPE that includes educationally nonessential extracurricular
and nonacademic activities.  The relevant regulations require
schools to provide supplementary aids and services that an IEP
team determines are needed to provide a disabled child with an
equal opportunity to participate in extracurricular and
nonacademic activities, without requiring a determination that
such an activity would yield an educational benefit.  See 34 CFR
§§ 300.107, 300.117.  Specifically, § 300.107(a) provides:

>     Each public agency must take steps, including the
>     provision of supplementary aids and services
>     determined appropriate and necessary by the child's
>     IEP Team, to provide nonacademic and extracurricular
>     services and activities in the manner necessary to
>     afford children with disabilities an equal opportunity
>     for participation in those services and activities.

Further, § 300.117 provides that the duty to provide an equal
opportunity means that schools "must ensure that each child with

a disability participates with nondisabled children in the extracurricular services and activities to the maximum extent appropriate to the needs of that child."

The regulations also define two key terms. "Nonacademic and extracurricular services and activities" are broadly defined with a non-exhaustive list of activities that includes athletics, transportation, recreational activities, and school-sponsored clubs or special interest groups. Id. § 300.107(b). In tune with § 300.107, the definition of "supplementary aids and services" refers to services rendered "in regular education classes, other education-related settings, and in extracurricular and nonacademic settings" in order to maximize the mainstreaming of disabled students. Id. § 300.42 (emphasis added).

The plain terms of the regulations neither limit the types of extracurricular and nonacademic activities that can be included in an IEP nor require a nexus to an educational benefit. The regulations only require that such activities be "appropriate" to the needs of a disabled student. See 34 C.F.R. § 300.107(a). Once an activity is deemed appropriate, the school "must ensure" that the disabled student has the supplementary aids and services that are "appropriate and necessary" for the student to participate. See id. § 300.117. Unlike its statutory counterpart, the regulatory definition of

supplementary aids and services makes clear that such services are not limited to educational settings.  Compare 20 U.S.C. § 1401(33), with 34 C.F.R. § 300.42.  The definition expressly includes services offered in extracurricular and nonacademic settings, which, in turn, encompass a broad array of activities, including school athletics.  See 34 C.F.R. §§ 300.42, 300.107(b).  Therefore, the regulations impose an obligation on schools to provide accommodations to ensure that disabled students have equal access to such activities even when participation is not necessary to further their educational goals.

At least two other courts have come to the same conclusion based on the plain language of the IDEA's implementing regulations.  See Indep. Sch. Dist. No. 12 v. Minn. Dep't of Educ., 788 N.W.2d 907, 914 (Minn. 2010); Meares v. Rim of the World Unified Sch. Dist., 269 F. Supp. 3d 1041, 1056–57 (C.D. Cal. 2016).  As the Minnesota Supreme Court explained, "[t]o limit extracurricular and nonacademic activities to those required only to educate the disabled student would require adding or reading words into the above IDEA regulations." Indep. Sch. Dist. No. 12, 788 N.W.2d at 914.  I also find persuasive that court's reasoning that holding otherwise would run counter to the regulations' equal opportunity provisions. See id. at 915.  Specifically, "[r]equiring disabled students to

prove an educational benefit, when nondisabled students need not, does not afford disabled students an equal opportunity to participate in" such activities.  Id. at 915.[4]

The Department of Education views these regulations as setting forth mandated components of a FAPE.  Section 300.107 was promulgated pursuant to the IDEA provision that delineates the requirements of a FAPE, whereas § 300.117 cites as its authority the IDEA's directive that a FAPE must be provided in the "[l]east restrictive environment."  See 34 C.F.R. §§ 300.107 (citing 20 U.S.C. § 1412(a)(1)), 300.117 (citing 20 U.S.C. § 1412(a)(5)).  Further, both provisions are organized under the sub-heading "Other FAPE Requirements" in a section addressing state eligibility for federal educational funding.  See 34 C.F.R. § 300.103 et seq.  This offers another textual clue that the regulations sought to expound on the scope of a FAPE.  Cf. Bhd. of R.R. Trainmen v. Balt. & Ohio R.R. Co., 331 U.S. 519, 529 (1947) (noting that headings of sections can be useful

---

[4]  I agree with the district court in Meares that the regulations do not run afoul of the Supreme Court's rejection of the notion of "strict" or "absolute equality . . . regardless of capacity" in the context of educational services required under the IDEA. See Meares, 269 F. Supp. 3d at 1055-56 (quoting Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley, 458 U.S. 176, 199-200 (1982)).  The regulations do not require that a disabled student be allowed to participate in extracurricular activities regardless of her capabilities; instead, they expressly take capacity into account by providing that such activities must be "appropriate to the needs of" the student.  See 34 C.F.R. § 300.117.

interpretive tools where they do not "undo or limit that which the text makes plain").

I have little trouble concluding that these regulations are entitled to deference.  See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837 (1984); see also Irving Indep. Sch. Dist. v. Tatro, 468 U.S. 883, 891-92 & n.9 (1984) (noting that deference is owed to regulations promulgated by Secretary of Education to implement provisions of IDEA).  Because the regulations were promulgated in the exercise of authority that Congress expressly delegated to the Secretary to Education to elucidate specific provisions of the IDEA, see 20 U.S.C. § 1406(a), they pass the threshold requirement for applying Chevron deference.  See United States v. Mead Corp., 533 U.S. 218, 226-27 (2001).  As discussed above, Congress has not "directly spoken to the precise question at issue," satisfying step one of the Chevron analysis.  See 467 U.S. at 842.  At step two, courts must "defer to the agency's interpretation unless that interpretation is unreasonable." Lovgren v. Locke, 701 F.3d 5, 31 (1st Cir. 2012); see Chevron, 467 U.S. at 843.  Here, the agency's interpretation is a permissible construction of the IDEA's FAPE requirement.  The Department of Education considered public comments that nonacademic activities such as athletics should not be included as part of a FAPE and reasonably concluded that its interpretation is consistent with the IDEA's

"great emphasis" on maximizing the mainstreaming of disabled children, including in extracurricular and nonacademic activities.  See Assistance to States for the Education of Children with Disabilities and Preschool Grants for Children with Disabilities, 71 FR 46540-01, 46583, 46589 (Aug. 14, 2006).

As applied in this case, the regulations show that participation in school sports was a component of Tveter's right to a FAPE.  Specifically, her right to a FAPE included a right to supplementary aids and services, as determined by her IEP team, that would give her an equal opportunity to participate in school sports to the maximum extent appropriate to her needs. The record includes ample evidence, including multiple notes from her treatment providers, that participation in both field hockey and tennis was appropriate to her needs.  Further, her proposed IEP included, at her mother's request, a sports-related accommodation, exempting her in certain circumstances from academic eligibility for sports – the very basis that Pinkerton used to try to bar her from joining sports teams.  The fact that Tveter rejected the proposed IEP does not relieve her of the exhaustion requirement.  See E. D. By & Through Dougherty v. Palmyra R-I Sch. Dist., 911 F.3d 938, 941 (8th Cir. 2019) (noting that it made "no difference that [plaintiffs] refused all services under the IDEA" because "[o]pting out of IDEA services does not unlock a pathway around exhaustion").

At their core, Tveter's claims allege that Pinkerton, through its various actions and inactions, interfered with her education by denying her opportunities to participate in school sports on an equal footing with nondisabled students.  Her sports-related claims, therefore, in substance seek relief from the denial of a FAPE.  They are grievances that Tveter should have raised, and that could have been remedied, in the administrative process that the IDEA delineates.  Accordingly, she was required to exhaust her administrative remedies under the IDEA before proceeding with her ADA and Section 504 claims in this court.

Applying the exhaustion principles from Fry to each of Tveter's ADA and Section 504 claims leads me to the same conclusion.  See Doucette v. Georgetown Pub. Sch., 936 F.3d 16, 24 (1st Cir. 2019) (endorsing a claim-by-claim analysis under Fry).  Tveter's discrimination claim rests on allegations that Pinkerton denied her opportunities to participate in tryouts for field hockey and tennis alongside nondisabled students based on academic criteria that failed to account for her Section 504 plan's accommodations and the NHIAA exemptions for disabled students.  Even after she was allowed to join those teams, Pinkerton allegedly continued to discriminate against her by denying her a team uniform during two seasons of tennis and by restricting her playing time, changing her position, and

removing her from the starting lineup during field hockey games.
The gravamen of this claim is the denial of an equal opportunity
to participate in school sports to the maximum extent
appropriate, which, as discussed above, is intertwined with her
right to a FAPE.  The Fry hypotheticals point in the same
direction, as such allegations could not be brought either
outside the school setting or by an adult at the school,
especially given the central role that Tveter's academic
performance played in Pinkerton's actions.  Cf. Wellman v.
Butler Area Sch. Dist., 877 F.3d 125, 134 (3d Cir. 2017)
(applying Fry and requiring exhaustion of ADA/Section 504 claim
arising from school's failure to accommodate student's requests
for safe participation on football team because it was
"intertwined with his complaints about the school's failure to
accommodate his educational needs, which include his
participation in extracurricular activities"); Clinton v. Dallas
Indep. Sch. Dist., No. 3:17-CV-2981-S, 2019 WL 1411474, at *4 &
n.6 (N.D. Tex. Mar. 27, 2019) (concluding that ADA/Section 504
claim based on allegations that plaintiff was initially denied
participation on football team and later refused playing time in
games concerned denial of FAPE under Fry and thus had to be
exhausted).

Tveter's retaliation claim likewise in substance seeks
relief from the denial of a FAPE.  Tveter alleges that

Pinkerton's discriminatory conduct detailed above was also retaliatory in response to her mother's complaints to the school that Pinkerton was violating Tveter's rights under the IDEA and other laws.  Prior to Fry, the First Circuit held that claims that a school retaliated against a student in response to parents' efforts to enforce the student's educational rights "relate unmistakably" to the provision of a FAPE and had to be exhausted.  See Rose v. Yeaw, 214 F.3d 206, 210 (1st Cir. 2000); see also Weber v. Cranston Sch. Comm., 212 F.3d 41, 51 (1st Cir. 2000).  Although the First Circuit has not revisited these holdings since Fry, other circuits have found the same approach is in line with the Fry test.  See Z.G. by & through C.G. v. Pamlico Cnty. Pub. Sch. Bd. of Educ., 744 F. App'x 769, 779 (4th Cir. 2018) (citing Rose, 214 F.3d at 210); S.D. by A.D. v. Haddon Heights Bd. of Educ., 722 F. App'x 119, 126–27 (3d Cir. 2018).

Applying the Fry hypotheticals, the Third Circuit in Haddon Heights explained that the retaliatory conduct at issue – enactment of an attendance policy that harmed the plaintiff's ability to advance in school – could not have occurred outside the school setting and an adult at the school could not have pressed the same claim.  See 722 F. App'x at 126–27.  So too here. The gist of the complaint's allegations is that the retaliation took the form of the denial of a FAPE.

29

Specifically, Pinkerton allegedly used academic standing as a
barrier to Tveter's participation in sports and otherwise denied
her opportunities to be a bona fide member of sports teams in
retaliation for her mother's complaints about the school's
handling of her requests for educational and other services to
accommodate Tveter's disability.  This particular type of
retaliatory conduct could not have occurred to Tveter outside
the school or to an adult at the school.  See Fry, 137 S. Ct. at
756.  Because the retaliation claim is thus grounded on
Pinkerton's failure to provide Tveter with a FAPE, it is subject
to the IDEA's exhaustion requirement.

Tveter's harassment claim is no different.  To the extent
the claim is based on allegations that Pinkerton's actions in
preventing her from joining sports teams and treating her
differently from her teammates constituted harassment, the above
analysis applies with equal force.  To the extent Tveter alleges
that Pinkerton was deliberately indifferent to her field hockey
teammates' bullying, as pleaded, the gravamen of the claim
concerns the denial of a FAPE.  The complaint alleges that this
same conduct forms a basis of Tveter's (previously dismissed)
IDEA claim.  Compare Am. Compl. ¶¶ 175-176, with id. ¶¶ 185-186.[5]
In pleading her IDEA claim, she incorporated her factual

---

[5] The complaint incorrectly numbered paragraph 186 as 185.

allegations concerning the bullying incidents, see Am. Compl.

¶ 171, and specifically alleged that Pinkerton was liable for

> failing to provide a Free and Appropriate Education
> (FAPE) and violating Individuals with Disabilities
> Education Act 20 U.S.C. § 1401 et seq. by . . . (c)
> [f]ailing to supervise, investigate, prohibit and
> prevent, and/or otherwise address the openly egregious
> hostile environment of disability discrimination, and
> bullying from Pinkerton Academy students towards
> [Tveter], which was counter[]productive to her
> receiving a Free and Appropriate Education.

Am. Compl. ¶ 175.  The complaint further charges that Pinkerton

"knew or should have known that this conduct was so severe,

pervasive, and offensive that it denied [Tveter] equal access to

a Free and Appropriate Education in violation of" the IDEA.  Am.

Compl. ¶ 176.  In other words, Tveter alleged that the

unremedied peer bullying resulted in the denial of a FAPE, which

several circuit courts have recognized as a viable theory of

liability under the IDEA.  See Renee J. as Next Friend of C.J.

v. Houston Indep. Sch. Dist., 913 F.3d 523, 531 (5th Cir. 2019);

M.L. v. Fed. Way. Sch. Dist., 394 F.3d 634, 650 (9th Cir. 2005);

Shore Regional High Sch. Bd. of Ed. v. P.S., 381 F.3d 194, 199-

200 (3d Cir. 2004); see also T.K. v. N.Y. City Dep't of Educ.,

810 F.3d 869, 876 (2d Cir. 2016) (assuming without deciding that

bullying can result in denial of FAPE).

　　With respect to peer bullying, Tveter's allegations in

support of her ADA and Section 504 claims are a mirror image of

her IDEA claim.  In pleading those claims, Tveter again

incorporated the facts concerning the episodes of bullying, see Am. Compl. ¶ 181, and then repeated nearly verbatim the above allegations that support her peer harassment claim under the IDEA.  See Am. Compl. ¶¶ 185-186.  The only difference is that she dropped the references to FAPE and asserted instead that the bullying "denied [her] equal access to an education in a vio[l]ation of Section 504 . . . and [the ADA]."  See Am. Compl. ¶ 186.  As pleaded, therefore, Tveter's ADA and Section 504 claims based on peer bullying rest on both the same facts and the same legal theory as her IDEA harassment claim.  Where the same conduct forms the basis of claims under both the IDEA and other laws, the court is entitled to consider the overlapping allegations as evidence that the plaintiff – the master of the complaint – in fact seeks a remedy available under the IDEA. See, e.g., C. G. by & through Keith G. v. Waller Indep. Sch. Dist., 697 F. App'x 816, 820-21 (5th Cir. 2017) (requiring exhaustion of Section 504 claim that was "not independent" of plaintiff's IDEA claim where both rested on same allegations); K.I. v. Durham Pub. Sch. Bd. of Educ., No. 1:19CV857, 2020 WL 3512213, at *9 (M.D.N.C. June 29, 2020) (holding that Section 504 and ADA claims were subject to IDEA's exhaustion requirement where plaintiffs alleged "that the same conduct violated the IDEA"); Tawes v. Bd. of Educ. of Somerset Cnty., No. CV RDB-17-2375, 2017 WL 6313945, at *5 (D. Md. Dec. 11, 2017) (requiring

exhaustion where plaintiff "brought an IDEA claim based on identical facts to those used to support . . . claims under other laws designed to protect children with disabilities"); cf. Parent/Prof'l Advocacy League, 934 F.3d at 27 (holding that IDEA's exhaustion requirement applied to ADA claims where "overlap is such that, in pleading what are on the surface ADA claims, the plaintiffs' complaint in substance 'seek[s] relief that is also available under' the IDEA").

Considering the Fry hypotheticals confirms this conclusion. As pleaded, the harassment claim could only be brought in a school setting and only a child could allege that peer bullying led to the denial of equal access to education. See Fry, 137 S. Ct. at 756. The harassment claim, therefore, does not "seek relief for simple discrimination, irrespective of the IDEA's FAPE obligation." Id. Instead, the claim expressly seeks relief that is available under the IDEA.[6]

---

[6] In the alternative, I conclude that no reasonable jury could find for Tveter on the harassment claim because there is no evidence that Pinkerton was deliberately indifferent to peer-on-peer bullying. See Thomas v. Springfield Sch. Comm., 59 F. Supp. 3d 294, 305 (D. Mass. 2014) ("The First Circuit has not yet addressed whether school district liability exists for peer-to-peer, disability-based harassment, but several circuits have found the standards applicable in Title IX cases also apply in cases alleging peer-to-peer, disability-based harassment.") (collecting cases); Fortin on behalf of TF v. Hollis Sch. Dist., No. 15-CV-00179, 2017 WL 4157065, at *3-4 (D.N.H. Sept. 18, 2017) (similar). A school is "deemed 'deliberately indifferent' to acts of student-on-student harassment only where [its] response to the harassment or lack thereof is clearly

I need not test the outer bounds of the IDEA's exhaustion requirement to resolve this case.  As I have explained, the IDEA protects a disabled student from discrimination, harassment, and retaliation on the basis of disability both when the student is pursuing educational goals in the classroom and while the student is engaging in nonacademic activities such as school sports that are a part of her educational program.  Tveter's complaint leaves no doubt that she is seeking in part to vindicate her right to a FAPE when pressing her sports-related discrimination, harassment, and retaliation claims.  Thus, her ADA and Section 504 claims are subject to the exhaustion requirement because she is "seeking relief that is also available under [the IDEA]."  See 20 U.S.C. § 1415(l).  Because Tveter failed to exhaust those remedies, I grant summary judgment to Pinkerton on her remaining federal claims.[7]

---

unreadable in light of the known circumstances.'" Davis v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 648 (1999).  Here, there is no evidence from which a jury could find that Pinkerton's response to any of Tveter's complaints of peer bullying was clearly unreasonable under the circumstances.  When such complaints were brought to Pinkerton's attention, school staff investigated and reasonably concluded that no bullying had occurred.

[7] For the reasons stated in my order on the defendants' motions to dismiss, Tveter has not shown that the futility exception to the exhaustion requirement applies to her case.  See Tveter, 2018 WL 3520827, at *4.

B.   **Negligence Claims**

In ruling on the defendants' motions to dismiss, I concluded that Tveter's negligence claims against Pinkerton and Coach Resmini based on their toleration of harassment by Tveter's field hockey teammates stated a claim upon which relief may be granted.  See Tveter, 2018 WL 3520827, at *9.  In her objection to the summary judgment motion, Tveter makes clear that the basis for these claims is the defendants' alleged negligent failure to supervise in connection with the two instances when her teammates caused physical injury to her head. See Doc. No. 203 at 3-4, 29.  I agree with the defendants that no reasonable jury reviewing the summary judgment record could find that the defendants are liable for those incidents.

The New Hampshire Supreme Court has recognized that secondary schools "share a special relationship with students entrusted to their care, which imposes upon them certain duties of reasonable supervision."  Marquay v. Eno, 139 N.H. 708, 717 (1995); see also Gauthier v. Manchester Sch. Dist., 168 N.H. 143, 147 (2015).  Not every harm that befalls a student while in a school's care, however, will support a claim for negligence. The court has explained that the duty of reasonable supervision extends "to only those periods of time when parental protection is compromised, and only to those risks that are reasonably foreseeable."  Mikell v. Sch. Admin. Unit #33, 158 N.H. 723, 731

(2009).  A school's duty of reasonable supervision of students participating in a sport, however, does not extend to eradicating "commonly appreciated risks which are inherent in and arise out of the nature of the sport generally and flow from such participation."  Hacking v. Town of Belmont, 143 N.H. 546, 553 (1999) (internal quotation marks omitted); see Allen v. Dover Co-Recreational Softball League, 148 N.H. 407, 417 (2002).  In other words, schools cannot be held liable for "injurious conduct that is not outside the range of ordinary activity involved in the sport."  Allen, 148 N.H. at 418 (emphasis in original).

Applying these principles to this case, I conclude that no reasonable jury could find the defendants liable for Tveter's physical injuries.  With respect to the incident when she was hit by a hockey ball during pregame warmups, the undisputed evidence shows that she was struck as a result of an inaccurate pass.  This is "an ordinary risk inherent within the game of [field hockey] that [Tveter] or her parents would have known and appreciated."  Hacking, 143 N.H. at 554; see Allen 148 N.H. 419 (concluding that "being injured by an errant throw is a common risk inherent in and arising out of a softball game").  But even if the hit was intentional, as Tveter argues without support, that fact alone is insufficient to show that Pinkerton breached its duty of reasonable supervision.  There is no evidence that

Pinkerton staff supervising the players ignored dangerous behavior, "lost control," or were otherwise negligent during the pregame warmups.  See Hacking, 143 N.H. at 553-54.

The same is true with respect to the incident when Tveter was injured by a sponge ball during a game of floor hockey in gym class.  There is evidence from which a jury could find that the incident involved an intentional hit and that this manner of injury is outside the range of the ordinary activity.  But there is no evidence that the defendants were negligent in supervising the activity.  The record shows that multiple members of Pinkerton staff were supervising the game, which involved playing with a sponge ball specifically designed for safe play.  Here too there is no evidence that the staff ignored dangerous behavior, "lost control of the game," or otherwise acted with negligence.  See Hacking, 143 N.H. at 553-54.  Given this record, no reasonable jury could find for Tveter on the negligence claims, so the defendants are entitled to summary judgment.[8]

---

[8] In a single-sentence footnote in their brief, the defendants raised discretionary function immunity as an alternative basis for granting summary judgment on the negligence claim.  See Doc. No. 180-1 at 20 n.9.  Because I determine that the claim fails on the merits, I need not address that defense.

## IV.   **CONCLUSION**

For the foregoing reasons, I grant the defendants' motion for summary judgment (Doc. No. 180).  The clerk of court is directed to enter judgment and close the case.

SO ORDERED.

/s/ Paul J. Barbadoro
Paul J. Barbadoro
United States District Judge

November 2, 2020

cc:  Elizabeth Tveter, pro se
     Alison M. Minutelli, Esq.
     Dean B. Eggert, Esq.